IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                             Criminal No. 3:24CR24 (GROH)

DONALD MCDUFFIN WILLIAMS,

      Defendant.

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Defendant Donald McDuffin Williams, through counsel, respectfully moves this Court, pursuant to Rule 12(b)(3)(c) of the Federal Rules of Criminal Procedure, the Fourth Amendment to the United States Constitution, and the holding of *Franks v. Delaware*, 438 U.S. 154 (1978), to suppress all evidence seized in this case from an illegal search. In support of this motion, Mr. Williams states as follows:

**I. INTRODUCTION**

Mr. Williams faces a two count Indictment. Count One charges possession with intent to distribute Fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Count Two charges possession with intent to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). The evidence relied upon to support these charges derives from a search warrant executed at 263 Cool Glen Circle, Harpers Ferry, West Virginia, on April 8, 2023. The affidavit in support of the search warrant contains defects and material omissions that call into question the constitutionality of any probable cause determination and necessitate a hearing pursuant to *Franks v. Delaware*. *See Search Warrant*, (April 8, 2023), attached as Exhibit 1. Without any good-faith exception, such constitutional defects call for suppression of the evidence in this case.

## II. STATEMENT OF FACTS

"When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." *United States v. Wilhelm,* 80 F.3d 116 (4th Cir. 1996). In this case, the affidavit and complaint for the search warrant presents information through three attachments. According to the cover page of the affidavit and complaint, the property to be seized is provided in "attachment #1," the premise to be searched is described in "[a]ttachment #2," and the facts believed to support probable cause are contained in "[a]ttachment #3." *See* Exhibit 1. To be clear, there is no document labeled "attachment #3." However, there are two documents labeled "Attachment #1" and one of them appears to contains the "[f]acts and beliefs" law enforcement relied upon in an effort to establish probable cause.

"Attachment #1," "[f]acts and beliefs" starts with a recitation of the affiants experience:

> My affidavit, Cpl. GW Kilmer of the Jefferson County Sheriff's Office. Cpl. Kilmer has been a Law Enforcement Officer in Jefferson County, West Virginia for 18 years. Cpl. Kilmer graduated from the West Virginia State Police Academy in May of 2005. During attendance at the West Virginia State Police Academy Cpl. Kilmer received training in laws of arrest, detection and investigation of crimes, search and seizure, crime scene search techniques and interview of witnesses.

*Id.* Next, the affiant describes his investigation. According to Officer Kilmer, on April 8, 2023, he responds to "the second overdose involving [280 Bluff Lane] within 2 two hour time period."

> On April 8, 2023 I, Cpl. Kilmer of the Jefferson County Sheriff's Office responded to an overdose complaint at the residence of 280 Bluff Lane which is located in Harpers Ferry, Jefferson County, West Virginia. This is the second overdose involving this residence within 2 two hour time period.

*Id.* Officer Kilmer goes on to describe "a subject living in the [280 Bluff Lane] residence" that he spoke with. *Id.* According to the affidavit, "the subject" provided him with the following information:[1]

---

[1] These paragraphs appear to contain all the information provided by "the subject."

> During this call I had the opportunity to speak with a subject living in the residence. While speaking with the subject it was stated to me the narcotics that caused the overdose were purchased from Donald Williams who is currently living at 263 Cool Glen Circle which is located in Shanondale Harpers Ferry, West Virginia.
>
> While speaking with the subject at 280 Bluff Lane it was stated Eric Jones who was later pronounced deceased at Jefferson Medical Center went to the residence of 262 Cool Glen Circle to meet Don and purchased a 40 bag. The subject also stated Donald Williams who goes by Don just went to the city to fill his supply of narcotics yesterday. The subject did write a statement regarding the conversation.

*Id*. In between the above-stated paragraphs, Officer Kilmer provides this additional information:

> . It should be noted I have also received several narcotics complaints regarding this residence as well up to and including one early morning complaint in which I was given a phone number to Don. It was stated in this complaint Don who the caller only knew as to be a black male was the one selling from the residence. I was also provided a phone number for Don by the caller.

*Id*. The affiant, then, provides the following information about contact with another officer:

> I then left the residence and contacted a member of the drug and violent crime task force who advised he conducted a recent controlled purchase utilizing a confidential informant on Don at the residence of 263 Cool Glen Circle.

*Id*. Officer Kilmer then states:

> At 0952 hours I was notified by Jefferson Medical Center the overdose victim was deceased. I am also applying for a warrant for the subject Donald Williams of 263 Cool Glen Circle for delivery resulting in overdose death.
>
> After being notified of the overdose death I opened the victims cell phone and observed there was a conversation with Don which was the same phone number I was given for Don the night prior that fell within the time frame the subject stated the victim purchased the drugs.

*Id*. "Attachment #1," "[f]acts and beliefs" concludes with the following language:

> The above listed training and experience leads me to believe there can be evidence of distribution along with possession with intent located within the residence of 263 Cool Glen Circle as well as the person of Donald Williams.

*Id*. Based on this information, the magistrate judge issues a search warrant for 263 Cool Glen Circle. According to the government's prior filing in this case, "a search warrant was issued for 263 Cool Glen Circle by [M]agistrate Roper at the same time she issued the arrest warrant. Cpl. Kilmer then traveled to 263 Cool Glen Circle to execute the warrants." ECF No. 15 at 5.

At this juncture, questions of fact arise with regard to the timeline. It is known that Officer Kilmer entered the courthouse at approximatley 11:53 a.m. on April 8, 2023. *See* Jefferson County Commission, *Quick report: Access events*, (August 13, 2024), attached as Exhibit 2. Whereas, it is known that the "arrest warrant was printed at 2:22 p.m. on April 8, 2023," Arabia Anderson, *Letter*, (October 4, 2024), attached as Exhibit 3, the actual time that Magistrate Roper issued the arrest warrant and the search warrant remains unknown. *See id*.

To obfuscate matters further, the government has previously stated that *"[a]ccording to Cpl. Kilmer's body camera footage*, the search team executed the search warrant. A copy of the CAD report for the Special Response Team's entry and securing the residence confirms a time of approximately 2:40 p.m." ECF No. 15 at 5 (emphasis added). However, Officer Kilmer's body camera footage shows the entry and securing of the residence taking place much earlier in time. According to Officer Kilmer's body camera footage, entry first took place at approximately 1:11 p.m. *See* G.W. Kilmer, *Kilmer Bodycam 1.MP4*, (April 8, 2023), attached as Exhibit 4 (US118). By approximately 1:19 p.m. the occupants of the residence are shown secured in handcuffs and seated in the drive way of the residence. *See id*. Whereas handwriting on the cover page of the search warrant suggests that Officer Kilmer served the search warrant at 3:00 p.m., *see* Exhibit 1, his body camera footage shows him placing Mr. Williams under arrest and securing him inside a police cruiser at approximately 1:21 p.m. *See* G.W. Kilmer, *Kilmer Bodycam 2.MP4*, (April 8, 2023), attached as Exhibit 5 (US119). On information and belief, there is no video footage of any warrant being served in this case. But there is video footage of Officer Kilmer searching Mr. Williams incident to his arrest. *See id.* And during that search, Officer Kilmer exclaims that he has located a key in Mr. Williams's pocket. *See id.* Mr. Williams is then placed under arrest and transported to the Sheriff's Office for processing.

Allegedly, Officer Kilmer uses the key to open "two safes," both "located in a room beside of the bedroom Mr. Williams was staying in." G.W. Kilmer, *Criminal Complaint Narrative*, (April 8, 2023), attached as Exhibit 6. At least one of these safes is alleged to contain the Fentanyl and cocaine base that makes up the prosecution against Mr. Williams. It is unclear how a single key opened two different safes. It is unclear what safe contained what item seized. On information and belief, there is no video footage that captures this part of the search: wherein Officer Kilmer opens two safes with one key to find the nearly, if not all, of the physical evidence. *See id*.

Despite repeatedly demonstrating his ability to operate the body camera and the functionality of that equipment, Officer Kilmer fails or refuses to record perhaps the most critical moment in his investigation. Worse still, no other law enforcement officer filmed it. With all the numerous law enforcement officers present on April 8, 2023, to participate in the search of 263 Cool Glen Circle, the dearth of video footage memorializing their efforts in this case is thought provoking. A review of the existing video footage seemingly depicts additional video recording devices, including objects that look like helmet cameras. *See e.g.* G. W. Kilmer, *Kilmer Bodycam 3.MP4*, (April 8, 2023), attached as Exhibit 7. But what may look like a video recording device to Mr. Williams, according to the government, "is not a video recording device."[2]

---

[2] The government has made timely discovery disclosures and engaged in good faith efforts to address Mr. Williams's additional discovery requests and concerns. On August 5, 2024, undersigned counsel requested additional discovery from the government, including "all body camera footage, helmet camera footage, dash camera footage, and any other video evidence collected from, or depicting, the execution of the warrants in this case on April 8, 2023." According to the government: "[t]he United States has requested all body camera and dash camera footage from law enforcement officers present at the scene who were equipped with and activate such footage. The United States has produced in Rule 16 all video footage that it received. Further, the United States inquired about body camera and/or helmet camera footage for the Special Response Team ("SRT"). At the time of the search, SRT was not equipped with body camera or helmet camera footage. Additionally, they were not required to be equipped with nor activate any body worn camera footage. Defense counsel has inquired about footage because he saw microphones/equipment that appeared to possibly be body worn camera footage. In speaking with SRT members, this is not equipment for body worn cameras. Instead, this is equipment for the "Push-To-Talk" system that enables team members to speak with each other during operations. It is not a video recording device."

### III. MEMORANDUM OF LAW

The Fourth Amendment to the United States Constitution guarantees Mr. Williams the right to be secure "against unreasonable searches and seizures." U.S. Const. Amend. IV. To protect this right, the Fourth Amendment requires that a warrant must (1) be issued by an independent, neutral and detached magistrate, (2) contain a "particular description of the place to be searched and the persons or things to be seized," and (3) be based "upon probable cause, supported by oath or affirmation." *Id*. Evidence obtained in violation of the Fourth Amendment is subject to suppression under the exclusionary rule, which bars its use in criminal proceedings against the victim of an illegal search and seizure. *See United States v. Perez*, 393 F.3d 457, 460 (4th Cir. 2004). The exclusionary rule of the Fourth Amendment applies to the illegally obtained evidence and also to its derivative uses. *See United States v. Crews*, 445 U.S. 463 (1980) ("the exclusionary sanction applies to any 'fruits' of a constitutional violation—whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention").

Although the "good-faith exception," first announced in *United States v. Leon*, 468 U.S. 897 (1984), may salvage an otherwise constitutionally defective warrant, the good-faith exception is inapplicable in the following scenarios: (1) when the warrant is based on an affidavit that contains "knowing or reckless falsity"; (2) when the magistrate has simply acted as a "rubber stamp" for the police; (3) when the affidavit does not "provide the magistrate with a substantial basis for determining the existence of probable cause;" or (4) when the warrant is so "facially deficient" that an officer could not reasonably rely upon it. *See Wilhelm*, 80 F.3d at 121 (citing *Leon*, 468 U.S. at 923).

## IV. ARGUMENT

Here, "the totality of the circumstances" *Illinois v. Gates*, 462 U.S. 213 (1983), presented in the affidavit and used to obtain the search warrant at 263 Cool Glen Circle, fails to pass constitutional muster. The evidence used in the instant prosecution stems directly from this search. Consequently, all such evidence must be suppressed. The argument is three-fold. **First**, Mr. Williams avers that the search warrant is invalid because the affidavit contains material omissions, and/or knowingly and intentionally false statements, and/or false statements that demonstrate a reckless disregard for the truth. **Second**, Mr. Williams argues that when such offending portions of the warrant are properly excised, the remainder fails to establish probable cause sufficient to show a nexus between the alleged criminal conduct and the place to be searched. **Third**, Mr. Williams concludes that *Leon's* good-faith exception does not apply to save the warrant. As a result, he respectfully requests that the Court conduct a *Franks* hearing and suppress all physical evidence obtained or derived from the defective warrant.

**1.      The search warrant affidavit contains false statements and material omissions.**

Mr. Williams contends that the affidavit contains reckless, if not knowingly and intentionally, false statements and material omissions. In consequence, he requests an evidentiary hearing on the validity of the warrant pursuant to *United States v. Franks*. Search warrant affidavits that include false statements made knowingly and intentionally, or with reckless disregard for the truth; or materials omissions of government officials, are subject to challenge and provide grounds for a *Franks* hearing. *United States v. DeLeon*, 979 F.2d 761, 763-64 (9th Cir. 1992) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)); *United States v. Colkley*, 899 F.2d 297, 301-02 (4th Cir. 1990) (a false statement can include a material omission).

To be entitled to an evidentiary hearing pursuant to *Franks* requires a dual showing that incorporates both the subjective and objective threshold components. *See Colkley*, 899 F.2d at 300. **First**, the defendant must make a substantial preliminary showing that a material omission or false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit. *See Franks*, 438 U.S. at 155-56. **Second**, the offending information must be essential to the probable cause determination. *Id*.

To obtain a *Franks* hearing, it is not required that the defendant present clear proof that misrepresentations were deliberate or reckless. All that is needed is a "substantial showing that supports a finding of intent or recklessness in making material representations or omissions in the affidavit supporting a search warrant." *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1111 (9th Cir. 2005); *see also United States v. McMurtrey*, 704 F.3d 502, 510 (7th Cir. 2013) (holding that in determining whether to grant a *Franks* hearing the court should not consider the government's explanation of contradictions and discrepancies). And where there are "discrepancies and contradictions in the affidavit," as there are in this case, it is error for the district court to allow "the government to offer evidence to explain [the discrepancies and contradictions] . . . without allowing the defense a full and fair opportunity to challenge the explanation." *McMurtrey*, 704 F.3d at 510 (remanding for full-*Franks* hearing, where district court committed procedural error by allowing the government to address contradictions in a pre-*Franks* hearing). As explained by the Court in *Franks*:

> [i]f, after evidentiary hearing, defendant establishes by a preponderance of evidence that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by affiant in search warrant affidavit, and, with affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, [the] search warrant must be voided and fruits of search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U.S. at 154.

Here, the motion to suppress based on *Franks* applies to these paragraphs of the affidavit:

> On April 8, 2023 I, Cpl. Kilmer of the Jefferson County Sheriff's Office responded to an overdose complaint at the residence of 280 Bluff Lane which is located in Harpers Ferry, Jefferson County, West Virginia. This is the second overdose involving this residence within 2 two hour time period.
>
> During this call I had the opportunity to speak with a subject living in the residence. While speaking with the subject it was stated to me the narcotics that caused the overdose were purchased from Donald Williams who is currently living at 263 Cool Glen Circle which is located in Shanondale Harpers Ferry, West Virginia.
>
> While speaking with the subject at 280 Bluff Lane it was stated Eric Jones who was later pronounced deceased at Jefferson Medical Center went to the residence of 262 Cool Glen Circle to meet Don and purchased a 40 bag. The subject also stated Donald Williams who goes by Don just went to the city to fill his supply of narcotics yesterday. The subject did write a statement regarding the conversation.
>
> I then left the residence and contacted a member of the drug and violent crime task force who advised he conducted a recent controlled purchase utilizing a confidential informant on Don at the residence of 263 Cool Glen Circle.
>
> After being notified of the overdose death I opened the victims cell phone and observed there was a conversation with Don which was the same phone number I was given for Don the night prior that fell within the time frame the subject stated the victim purchased the drugs.

*See, e.g.,* Exhibit 1.

**The first paragraph** listed above demonstrates that Officer Kilmer knew of an earlier overdose at 280 Bluff Lane, which occurred less than two hours before he arrived to investigate the overdose of Eric Jones. Importantly, there is no allegation that this first overdose out of 280 Bluff Lane on April 8, 2023, bore any connection to Mr. Williams or the residence of 263 Cool Glen Circle. Beyond establishing the identical location and nearly contemporaneous timing of the first overdose and second overdose, Officer Kilmer omits all other information pertaining to the first overdose from the affidavit. His omission of other basic information is as telling as it is intentional. Under the totality of the circumstances, information about that first overdose is material to the probable cause determination at issue. This omission calls for a *Franks* hearing.

Given the close spatial and temporal proximity of the overdoses, additional information such as: the identity of the first overdose victim, what substance(s) caused or contributed to their overdose, where such substance(s) came from, who sold the substance(s), the witness(es) present at the scene of the first overdose and the statements they made, all become necessary to a finding of probable cause in this case. Practical considerations and commonsense compel the conclusion that two overdoses with such spatial and temporal proximity share a connection. The fact that no connection is alleged between Mr. Williams and the first overdose is material to the probable cause determination, even if through negative implication. *The expression of one thing implies the exclusion of others.* With everything else at issue in this affidavit, the fact that the affiant omitted all information about the first overdose at 280 Bluff Lane on April 8, 2023, raises a serious concern that these omissions were knowing and intentional or recklessly undertaken in an effort to bolster the affidavit's chances of establishing probable cause to support the issuance of a search warrant against Mr. Williams and 263 Cool Glen Circle.

**The second and third paragraphs** listed above reference alleged statements from an individual "*subject living in the residence*" of 280 Bluff Lane. *See* Exhibit 1 (emphasis added). Although the affiant fails or refuses to identify "the subject," *id.*, video footage indicates that only one actual person living at 280 Bluff Lane is interviewed by Officer Kilmer on April 8, 2023—Raymond Horney. *See* G.W. Kilmer, *Bodycam 1 Jones Overdose.MP4*, (April 8, 2023), attached as Exhibit 8 at 1:15. To be clear, Officer Kilmer asks Raymond Horney and Marissa Staubs, "do you two both live here?" *Id*. Whereas Mr. Horney responds in the positive, Ms. Staubs responds in the negative. *See id*. Minutes later, Ms. Staubs reiterates to Officer Kilmer, "no I don't live here." *Id*. at 4:07. Ms. Staubs then describes the location of her residence as being different than that of 280 Bluff Lane. *Id*. at 5:55.

Make no mistake, when Officer Kilmer wrote the search warrant affidavit, he knew that Mr. Horney lived at 280 Bluff Lane but that Ms. Staubs did not. The recorded interview of Mr. Horney, *the only subject living at 280 Bluff Lane*, materially differs from the information contained in the affidavit and supports a *Franks* hearing. The interview of Mr. Horney starts at or around 9:20 a.m. with Officer Kilmer asking Mr. Horney how he knows Mr. Williams. Mr. Horney responds, "I've heard of him but that's about it." *See* G.W. Kilmer, *Bodycam 3 Jones Overdose.MP4*, (April 8, 2023), attached as Exhibit 9 at 2:48. Mr. Horney says, "I don't know what that goes on." *Id*. at 3:16. He states, "I've never seen money exchanged, I've never seen the drugs exchanged, I just know of Don. I've met him once." *Id*. at 3:21.

Officer Kilmer recommences his interview of Mr. Horney at or around 12:42 p.m. *See* G. W. Kilmer, *Bodycam 4 Jones Overdose.MP4*, (April 8, 2023), attached as Exhibit 10. This time, Officer Kilmer asks Mr. Horney, "where did you drive [Eric Jones] to yesterday?" *Id*. at 1:18. He responds, "somebodies house." *Id*. at 1:20. "Where at," asks Officer Kilmer. *Id*. at 1:23. Mr. Horney replies, "I don't know the address, he just told me where to turn." *Id*. at 1:25. Officer Kilmer asks Mr. Horney, "what did he say when you all were going there?" *Id*. at 2:27. "Nothing," says Mr. Horney. *Id*. at 2:30. According to Mr. Horney, Mr. Jones "just said he needed to go stop by a friends house." *Id*. at 2:31. "What did he say when he got back in the car," asks Officer Kilmer. *Id*. at 2:55. "Not much," responds Mr. Horney, "he came back, we were coming back here, and he was talking about her[3] uncle that the cops were looking for him and that is pretty much really all we really talked about." *Id*. at 3:00. Mr. Horney states that he drove Mr. Jones when "it was still light out." *Id*. at 3:20. When asked if he saw anyone else at 280 Bluff Lane on April 7, 2023, Mr. Horney answers "I did see somebody leave when it got dark and I'm guessing that was her uncle, I don't know." *Id*. (at 3:40).

---

[3] On information and belief, "her" refers to Marissa Staubs.

Officer Kilmer omits all of the information provided by Mr. Horney from the search warrant affidavit. Worse still, his own body camera footage demonstrates that these two paragraphs of the affidavit, which again, only make reference to information from a single "subject living at the residence [280 Bluff Lane]," *see* Exhibit 1, contain false statements—knowingly and intentionally, or with reckless disregard for the truth—included by the affiant in the search warrant affidavit. To be clear, none of the information in the affidavit attributed to "the subject living in the residence" is supported by the recorded interview of Mr. Horney, the only subject interviewed by Officer Kilmer who lived at the residence. *See* Exhibit 1; *see also* Exhibit 8. Both paragraphs contain material omissions and/or false statements (knowing and intentional or with reckless disregard for the truth). As a result, Mr. Williams requests a *Franks* hearing and that all information in those paragraphs be struck from the affidavit.

**The fourth paragraph** listed above also should be struck from the affidavit and probable cause analysis following a *Franks* hearing. In this paragraph, the affiant claims "a member of the drug and violent crime task force . . . advised he conducted a recent controlled purchase utilizing a confidential informant on Don at the residence of 263 Cool Glen Circle." Exhibit 1. The affiant makes material omissions with regard to the date of the controlled buy and who conducted it. The affiant's use of the word "recent" is wholly conclusory and without sufficient supporting facts and circumstances for the judge to make an independent probable cause determination into whether this information is stale. Moreover, the affiant's statement here appears recklessly false. The video footage capturing this event does not appear to depict what is alleged in affidavit. *See* VIDEO_2023-03-20T19.37.01-04.00_0.mp4, (March 20, 2023), attached as Exhibit 11; VIDEO_2023-03-20T19.37 .01-04.00_1.mp4, (March 20, 2023), attached as Exhibit 12; VIDEO_2023-03-20T20.18.58-04.00_0.mp4, (March 20, 2023), attached as Exhibit 13.

***The fifth paragraph*** listed above suffers from the same defects, false statements, and material omissions as those discussed before it. Here, Officer Kilmer alleges that he observed "a conversation with Don" on Mr. Jones's cell phone "that fell within the time frame the subject stated the victim purchased the drugs." Exhibit 1. The affiant omits any detail as to the parameters of this "time frame." Likewise, no information is provided about the conversation Officer Kilmer allegedly observed. More to the point, evidence of a phone call is not the same as evidence of a conversation, let alone one that also supports probable cause to issue a search warrant for 263 Cool Glen Drive. No information is provided by the affiant about who initiated the call, when it was made, how long it lasted, or even if the call was answered. These omissions are material because that information is necessary to the finding of probable cause. Without more, the information in this paragraph adds nothing to a probable cause determination.

Worse still, this paragraph continues to demonstrate the affiant's sustained disregard for accurately reporting the facts in a sworn affidavit. Again, Officer Kilmer writes that "the subject" stated "the victim" purchased the drugs within the time frame of the conversation he purportedly observed. Again, Mr. Horney never made any such statement. Here, it must be emphasized that language is important and word choice matters, perhaps most, when invoked to move through—or else break against—the Constitution and the rights it was written to protect. The fact is that the affidavit only ever refers to "the subject" in the form of a singular noun and immediately qualifies that "the subject" is the person living at 280 Bluff Lane. Only Raymond Horney matches that description. Marrisa Staubs does not. Moreover, Mr. Horney is the only person with firsthand knowledge of where Eric Jones actually traveled in the hours before he overdosed. Marrisa Staubs does not. The affiant knew all of this when he wrote the affidavit. These false statements and/or material omissions further necessitate a *Franks* hearing and should be struck.

**2.      The search warrant affidavit does not establish probable cause.**

Here, the knowing and intentional or reckless inclusion of false information, coupled with material omissions, sheds some light on police motivations. The above arguments not only support a *Franks* hearing; but also, a finding that the search warrant in this case was so lacking in probable cause as to render it unconstitutional and to require the suppression of all evidence seized or derived from it. For when the affidavit's false materials are set aside, what remains left is little more than conclusory assertions that lack the indicia of reliability to provide the magistrate a basis for independently determining probable cause. Before a magistrate can find probable cause, it must be determined that everything in the affidavit—including the "veracity," "reliability," and "basis of knowledge" of the informant providing the information—indicate a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. "[A] conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause" fails to meet this requirement. *Id*. at 239.

To be certain, a magistrate cannot merely ratify the bare conclusions of others, *id*. at 213, including those made by "zealous officers." *Johnson v. United States,* 333 U.S. 10, 14 (1948) (requiring "inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime"). And in this case, the affiant makes wholly conclusory statements about "several narcotic complaints" alleged to involve 263 Cool Glen Circle and at least one complaint alleging Mr. Williams was selling from the residence. However, these allegations are bare bone. They amount to anonymous tips. Anonymous tips that lack the kind of predictive information needed to test the knowledge or credibility of those who made them. With these tips the affiant provided the magistrate virtually no basis for  independently determining the existence of probable cause.

These remaining provisions provide additional grounds to challenge the sufficiency of Officer Kilmer's affidavit, for the degree of reliability contained within them is low. The credibility of any anonymous tip is low. In fact, the reliability of an anonymous tip is so low that in order to form a sufficient factual basis for probable cause in a search warrant, anonymous tips require independent corroboration of the alleged information to sufficiently indicate reliability. *See Wilhelm*, 80 F.3d at 119-20; citing *Lalor*, 996 F.2d at 1581 (in evaluating whether an informant's tip established probable cause, an important factor is "the degree to which it is corroborated"). The reliability of an anonymous tip may be bolstered by predicative information that provides a means to test the informant's basis of knowledge or credibility. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000). But "'mere confirmation of innocent static details is insufficient.'" *Wilhelm*, 80 F.3d at 120 (quoting *United States v. Mendonsa*, 989 F.2d 366, 369 (9th Cir.1993)). Here, there is a lack of independent police corroboration for the magistrate to consider. Removing the parts of the affidavit containing material omissions, false information, and wholly conclusory statements removes probable cause to believe that evidence of Mr. Williams's possession of a controlled substance with intent to deliver will be found at 263 Cool Glen Circle. Without a sufficient nexus, there is no probable cause and the evidence seized or derived from the search warrant should be suppressed.

3.   **The good-faith exception does not salvage the defective search warrant.**

*United States v. Leon* cannot salvage the above-stated defects. *See* 468 U.S. 897 (1984). The *Leon* Court recognized a good-faith exception to the suppression of evidence obtained from a deficient warrant. *Id.* 468 U.S. at 897. Under *Leon's* good-faith exception, evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was objectively reasonable. This exception applies unless (1) the

15

warrant is based on an affidavit containing "knowing or reckless falsity," (2) the magistrate failed to "perform his neutral and detached function: and merely served as a "rubber stamp" for police, (3) the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or (4) the warrant is so facially deficient that no reasonable officer would presume it to be valid. *Id*. at 914-15.

*First*, as argued above, the affidavit in this case contains numerous knowing and intentional or reckless false statements and material omissions. So much so that Mr. Williams has moved to suppress the physical evidence obtained by, or derived from, the search warrant based on *Franks* and satisfied the threshold requirements necessary to be entitled to a hearing pursuant to *Franks*. *Leon* expressly excepts from the scope of its holding warrants that are challenged under *Franks v. Delaware*. *See* 468 U.S. at 923.

*Second*, the affidavit contains wholly conclusory statements from unnamed and anonymous informants without independent police investigation to corroborate their otherwise unsubstantiated claims. In fact, the affidavit is silent as to any investigation into the veracity or reliability of any of the informants alleged by the affiant to have made statements. *See*, *e.g.*, *Wilhelm*, 80 F.3d at 116 ("[g]ood-faith exception to exclusionary rule did not apply where warrant was supported only by affidavit containing information supplied from anonymous informant with no indication of informant's truthfulness or reliability, officer conducted only minimal corroboration and magistrate acted as rubber stamp in approving bare bones affidavit"). *Leon* does not save "a bare bones affidavit unsupported by probable cause." *Wilhelm*, 80 F.3d at 121-122 (citing *United States v. Laury,* 985 F.2d 1293, 1311 n. 23 (5th Cir.1993) ("defining 'bare bones affidavit' as one that contains 'wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause'")).

16

In *Wilhelm*, no good-faith exception was found when an officer obtained a search warrant based solely upon an anonymous phone caller's tip that the caller had recently observed drug sales in Wilhelm's residence. There, the affiant made no effort to identify the caller or provide any other identifying information. Here, Officer Kilmer fails to identify anyone, despite the claim of "several narcotics complaints." Exhibit 1. What identifying information Officer Kilmer does provide fails to go beyond innocent static details, such as race, which is wholly insufficient under the standards of probable cause. Like in *Wilhelm*, there is also a failure to meet any of the complainants in person. *Wilhelm* held these facts insufficient to support the issuance of a search warrant for the residence "because it 'depended on information from an unnamed informant' and offered only 'conclusory descriptions' rather than specific information that would establish the 'informant's truthfulness or reliability.'" *United States v. Perez*, 393 F.3d 457, 464 (4th Cir. 2004) (quoting *Wilhelm*, 80 F.3d at 118, 120). The Court should hold the same for Mr. Williams.

***Third***, removing the knowing or reckless false statements, material omissions, and wholly conclusory statements, leaves an affidavit that is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. In *Perez*, the Fourth Circuit addressed why it determined the good-faith exception did not apply in *Wilhelm*. The *Perez* Court noted, while not finding the *Wilhelm* affidavit was presented in bad faith, that the police representations in the affidavit *"str[uck] [the] [C]ourt as attempts to endue the affidavit with the appearance of genuine substance"* and that *"this tactic suggests that [the officers] knew that probable cause was lacking, and thus that reliance on the resulting warrant was not reasonable." Perez,* 393 F.3d at 465 (emphasis added). Here, the facts indicate Officer Kilmer utilized tactics similar to those utilized by the affiant in *Wilhelm*, which suggests his similar state of mind to that officer—"[the officer that] knew that probable cause was lacking." *Id*.

Officer Kilmer's reliance on nondescript and anonymous informants highlights the exact mindset that the Fourth Circuit took issue with in *Wilhem*. Officer Kilmer's repeated misrepresentations regarding "the subject living in the residence," is a showcase of that same mindset but in more extreme light. Additionally, Officer Kilmer appears to have misled the magistrate, or at least acted with reckless disregard, in his presentment of vague and conclusory information about a "controlled purchase utilizing a confidential informant on Don at the residence of 263 Cool Glen Circle." Even the timeline of Officer Kilmer's investigation, when compared to the timeline of his search warrant application and its issuance, raises questions into police motivation and the knowing and intentional or reckless utilization of tactics designed to circumvent probable cause where none existed. These facts not only support argument that the affidavit was so lacking in indicia of probable cause as to render official belief in its existence unreasonable; but also, such points equally fall within *Leon's* first category of circumstances that do not permit good faith reliance on a warrant.

**Finally**, after properly excising the unconstitutional portions of the affidavit, the search warrant is so lacking in information that it is insufficient to establish a nexus between the illegal activity alleged and the place to be searched. In essence, it converts into a facially deficient warrant. For all of these reasons, the Court should find the good-faith exception to the exclusionary rule inapplicable. Accordingly, all evidence seized during, or derived from, the search of 263 Cool Glen Circle should be suppressed.

## V. CONCLUSION

The search warrant affidavit in this case consists of an aggregation of knowingly or recklessly false information, material omissions, and wholly conclusory statements that when analyzed together are not convincing, corroborated, nor credible. Based on all of the forgoing,

Mr. Williams respectfully requests that this Court conduct an evidentiary hearing pursuant to *Franks* and at the conclusion of that hearing suppress all evidence seized from the search of 263 Cool Glen Circle on April 8, 2023, as well as all other evidence that flows from that illegal search.

    Respectfully submitted,

    **DONALD MCDUFFIN WILLIAMS,**
    **by counsel,**

    /s/Aaron D. Moss
    Aaron D. Moss (WV Bar #12789)
    Federal Public Defender Office
    651 Foxcroft Avenue, Suite 202
    Martinsburg, West Virginia 25401
    Tel. (304) 260-9421
    Fax. (304) 260-3716
    E-Mail. aaron_moss@fd.org

## CERTIFICATION OF SERVICE

I hereby certify that on October 9, 2024, I electronically filed the foregoing, ***Defendant's Motion to Suppress Evidence***, with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Lara Omps-Bottiecher, AUSA
Office of the United States Attorney
U.S. Courthouse
217 W. King Street, Suite 400
Martinsburg, WV 25401

/s/*Aaron D. Moss*
Aaron D. Moss (WV Bar # 12789)
Federal Public Defender Office
651 Foxcroft Avenue, Suite 202
Martinsburg, West Virginia 25401
Tel. (304) 260-9421
Fax. (304) 260-3716
E-Mail. aaron_moss@fd.org